Filed 1/30/26  Peniche v. California Highway Patrol CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| DORIS PENICHE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA HIGHWAY PATROL et al.,<br><br>      Defendants and Appellants. | B341399<br><br>(Los Angeles County Super. Ct. No. 20STCV18935) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph Lipner, Judge.  Affirmed.

Rob Bonta, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, Kenneth C. Jones, Supervising Deputy Attorney General, and Jaclyn V. Younger and Joseph R. Wheeler, Deputy Attorneys General, for Defendants and Appellants.

Seals Phillips, Collin Seals, Steve Cooley, Charles L. Murray III, and Justin Feffer for Plaintiff and Respondent.

_____

In 2018, in connection with an investigation into overtime fraud, defendant and appellant California Highway Patrol (CHP) obtained a search warrant for plaintiff and respondent Doris Peniche's cell phone. Peniche's complaint against CHP and defendant and appellant Melissa Hammond—which also named defendants Robert Ruiz and Matt Lentz, who were found not liable and thus are not parties to this appeal—alleged the defendants mishandled irrelevant images and videos of Peniche engaged in sexual activity that were on Peniche's phone.

After an approximately two-week jury trial, and two days of deliberation, a jury found CHP and Hammond liable to Peniche for negligence, and Hammond additionally liable to Peniche for intentional infliction of emotional distress; the jury awarded a total of $1,000,000 in damages. The trial court entered judgment to that effect.

On appeal, appellants assert that: (a) the litigation privilege bars the claims Peniche successfully asserted against appellants; (b) the verdict for negligence must be reversed because Peniche sought only emotional distress damages and, as a matter of law, appellants owed no duty of care to prevent Peniche from suffering emotional distress; and (c) substantial evidence does not support the jury's verdict against Hammond for intentional infliction of emotional distress. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.** *CHP Obtains Peniche's Cell Phone Records*

In 2018, CHP applied for search warrants to investigate whether officers were claiming overtime for hours they did not work. The warrants requested the cell phone records of the officers being investigated, on the theory that those records could

show the officers' whereabouts during the times they claimed to be working overtime at specific sites. Peniche was among the officers investigated. The search warrant for Peniche's records ordered "that all information obtained via this search warrant which is determined not to be evidentiary in nature for the crimes being investigated be partitioned and sealed; preventing further viewing."

CHP's Internal Investigations Manual defines a "Criminal Investigation" as "A formal investigation into alleged criminal misconduct which may lead to exoneration or a recommendation of criminal prosecution, with concurrence of the Office of the Commissioner." It defines an "Administrative Investigation" as "A formal investigation into alleged violations of policies or procedures, or poor performance, resulting in either exoneration or administrative sanctions, or other civil misconduct contemplated by Government code section 19572." For joint investigations, the Manual provides, "While criminal and administrative investigations of the same act(s) will largely draw from the same evidentiary and witness resources, there can be significant differences in the focus of each investigation. In addition, there are important limitations regarding what information can be shared between the investigations." "In general, information gathered during either a criminal or administrative investigation may be included in the other investigation, as long as it was gathered from a source that both administrative and criminal investigators would have had legal access. This will commonly allow the administrative investigator to have access to all information gathered in the criminal investigation, but can preclude the criminal investigator from having access to material from the administrative investigation."

The Manual also emphasizes the "[i]mportance" of "investigative confidentiality" (all caps and underline removed), stating "[s]upervisors, managers, and all others with information pertaining to an investigation have a legal and ethical obligation to maintain the confidentiality of an internal investigation. Investigators shall only discuss aspects of the investigation with person(s) who have an official right and need to know. An unnecessary release of confidential information can lead to an employee's personnel matter(s) being released to fellow employees and potentially to the public."

## B.  *Peniche Files a Complaint*

In May 2020, Peniche filed a complaint, which she amended twice, once in July 2020 and again in February 2023. The second amended (and operative) complaint named as defendants CHP, Hammond, Robert Ruiz, and Matt Lentz. Peniche alleged that, as a CHP employee, Peniche's cell phone was a "target of a search warrant," through which CHP "was attempting to correlate cellular activity with the CHP's theory that officers were obtaining unauthorized CALTRANS overtime." Peniche contended the court ordering the search warrant "specifically ordered that 'all information obtained via the search warrant which is evidentiary in nature for the crimes being investigated be partitioned and sealed to prevent further viewing.'"

Included in the data obtained from Peniche's phone were "several images and videos of Plaintiff engaged in sexual activity with a male individual." Peniche alleged Ruiz and Lentz "were employed as part of the administrative investigative team that CHP had assembled for purposes of conducting an administrative investigation into to alleged CALTRANS overtime issues."

4

Peniche further alleged that Ruiz and Lentz viewed, "disclosed and disseminated the private confidential and sexual information contained on Plaintiff's cellphone," and shared the images with Hammond.

Hammond subsequently told Sergeant Connie Guzman that "the 'rumors have been confirmed' that Plaintiff was having an affair with Plaintiff's brother-in-law," when in fact the rumors were false. "Hammond further informed Connie Guzman that she had seen videos and pictures of Plaintiff with Plaintiff's brother-in-law and several other men in various sexual positions that Plaintiff likes." Peniche alleged she was approached by a CHP officer who asked her about rumors he had heard from another officer regarding the discovery of Peniche's sexual videos.

Based on these allegations, Peniche brought nine causes of action: (1) Intrusion of Private Affairs; (2) Public Disclosure of Private Facts; (3) Distribution of Private Sexual Material in violation of Civil Code section 1708.85; (4) Negligence; (5) Negligent Infliction of Emotional Distress; (6) Intentional Infliction of Emotional Distress; (7) Defamation Per Se; (8) Defamation Per Quod; and (9) Negligence Per Se.

In May 2023, CHP and Hammond answered Peniche's complaint. Among the affirmative defenses asserted was "Privilege," in which they claimed, "Any communication by Answering Defendant regarding Plaintiff was not unlawful because it was subject to privilege under the common law and under Civil Code section 47."

## C.  *Trial*

Jury trial commenced on May 20, 2024, and the parties concluded their closing arguments on June 4, 2024. The jury reached a verdict two days later.

5

### 1.   Testimony

We summarize only the testimony and witnesses relevant to this appeal.

### (a)   Lieutenant Martin Geller

Geller testified he was the officer who authored the search warrant for Peniche's cell phone data and downloaded that data from Peniche's cell phone carrier. He reviewed the downloaded information to ensure the contents complied with the search warrant. In doing so, he saw sexual images of Peniche. Geller notified the other investigators working next to him of the images so they would not be surprised if they saw them. He then burned a copy of the data onto a compact disc and uploaded the data to a secured server accessible to the criminal team investigators, some members of the administrative investigation team, and internal affairs. Geller did not follow up to ask whether the sexual images were found relevant to the criminal investigation and did not ensure the sexual images were partitioned or sealed.

### (b)   Officer Stephen Wadleigh

Wadleigh testified he was assigned to investigate overtime fraud in late June 2018. In that capacity, he authored hundreds of requests for search warrants—in none of those requests did he indicate the information obtained through the warrants would be given to the administrative investigation team. Wadleigh was not the investigator assigned to Peniche, but he was asked to review her text messages, photographs, and videos. He reviewed the sexually explicit photos of Peniche and did not believe they were relevant to the criminal investigation. There was no metadata on any of the sexually explicit photos he checked. He

was surprised those files had been uploaded to the secured server and shared with the administrative investigation team.

### (c) Assistant Commissioner Charlie Sampson

Sampson testified he was the head of the criminal investigation into fraudulent overtime. Internal affairs requested the criminal team set up a shared drive to which data could be uploaded because the administrative investigation team was conducting a parallel investigation. Certain members of the administrative investigation team had rights to access this drive. Sampson explained the purpose of having an officer review the data received from search warrants before uploading it to the shared drive was to ensure the data received actually pertained to the officer being investigated.

Sampson testified that in mid-2019, he received a phone call "regarding the lawsuit of Ms. Peniche" that "photos were being shared in an inappropriate manner." He asked David Yokley (a lieutenant who was part of the criminal investigation team) to investigate; Yokley spoke with Geller and directed him to remove the sexual photos from the network drive.

### (d) Captain Andrew Beasley

Beasley testified CHP had designated him the person most qualified on a variety of topics, including the identification of the individuals who may have accessed the cell phone data obtained about Peniche, and when such access may have occurred. Beasley was unable to determine who had access to Peniche's data because the tool CHP used to audit such access trails only stored the information for 90 days, and by the time Beasley was

asked to ascertain this information, more than 90 days had passed.

### (e)    Captain Scott Poyner

Poyner testified he was assigned to work on the administrative investigation team. Poyner and two others on the administrative team (Lieutenant Gill and Margaris) had access to data from the criminal team allowing them to copy the data to a drive shared by the administrative team; once copied, anyone on the administrative team could see it.

Poyner was initially assigned to investigate Peniche before the responsibility was transferred to Sergio Perez. Lentz was initially the second investigator on Peniche's case, and then Poyner believed the second investigator role was transferred to Ruiz.

In reviewing the files in Peniche's folder, Poyner saw one sexual image of her. Poyner did not remove the sexual image because, while the administrative investigation team had decided the image was irrelevant so far, "maybe it was going to come into play later."

### (f)    Chief Chris Margaris

Margaris testified he managed the administrative investigation team, whose job was to investigate whether certain CHP employees violated CHP policy. There was an understanding that the criminal investigation team would provide all its material to the administrative investigation team, who would then determine what was relevant to their investigation.

### (g)    Sergeant Matthew Lentz

Lentz testified he saw one image of Peniche that he termed "sexual."  The photograph depicted Peniche with a male, and both were "scantily clad"—the male had no shirt on, but Peniche had something covering her breasts; no genitalia was visible in the photo.  Peniche was standing and the man was sitting on a bed.  Lentz saw this photo on Poyner's computer when he was sitting at a table with Poyner and Gill discussing a case.  Lentz did not discuss Peniche's sexual photos or videos with Ruiz and did not show them to Hammond.

### (h)    Lieutenant Ray Bembi

Bembi testified that he was working in the East Los Angeles branch of CHP when the investigation began, and that he learned about the investigation from Hammond.  When asked how he found out about an administrative investigation, Bembi stated "the reality is in our department, sir, nothing stays quiet.  As soon as something is out, word spreads quickly."  Bembi also "bec[a]me aware"—either directly from Hammond—or through Guzman, who had heard it from Hammond—that sexual photos had been found on Peniche's phone.  Bembi said Hammond received information from "buddies" on the administrative investigation team.  Bembi also recalled hearing from Hammond a rumor Peniche had an affair with her brother-in-law.

### (i)    Sergeant Robert Ruiz

Ruiz testified he was a friend of Hammond's.  Ruiz saw at least one sexual image of Peniche on Poyner's screen as he was walking back to his desk from the printer.

### (j)     Connie Guzman

Guzman testified she retired from CHP on November 1, 2018, after she was accused of "overtime theft." Rather than fight the accusation, she retired on the advice of her friend Hammond, who had overheard a conversation between a chief and two captains, in which they discussed investigating and ultimately terminating Guzman. Until early 2018, Guzman was Peniche's supervisor.

In 2018, Guzman heard rumors about Peniche's sex life. At a training event involving Peniche, Peniche's brother-in-law, Guzman, and Hammond, Hammond told Guzman that she believed "something was going on" between Peniche and her brother-in-law, and Hammond requested Guzman speak with Peniche about it, because "the appearance of it didn't look good."

In the summer or fall of 2018, Hammond called Guzman to tell her what had been found on Peniche's phone. Guzman testified that, one evening, Hammond called her while Guzman was working and asked her to go somewhere "secure" where she could talk. Guzman went to a vacant room and, after she told Hammond she could talk, Hammond repeatedly asked her "to promise her not to tell anything"; Guzman "kept telling her I wouldn't." Hammond then asked Guzman whether Guzman remembered when Hammond thought Peniche had been having an affair with her brother-in-law; Guzman said she did. Hammond said, "well, they are." When Guzman asked how Hammond knew, Hammond said she had seen several pictures and videos of Peniche performing oral sex on several men. When Guzman asked whether one of the men was Peniche's brother-in-law, Hammond "avoided" the questions and said, "I know it's him." When asked if she learned this information from the data

procured through the search warrants, Hammond avoided those questions as well and "said something to the effect that . . . [s]he got the information from her boys." Guzman responded, "Who, Rob Ruiz and Matt Lentz?" Hammond did not confirm it but also did not say, "it's not them." Hammond had previously been "vocal" about her friendship with Ruiz and Lentz and, during previous conversations in which Hammond revealed things about the investigation to Guzman, Hammond said she heard the information from them. Immediately after this conversation, Guzman told Ed Rice, Ray Bembi, Gio Bembi, and Gerard Diaz (all "fellow sergeants").

In April or May 2019, Guzman had dinner with Peniche and told her what Guzman had learned; Peniche was embarrassed, hurt, and in tears.

### (k)    Captain Melissa Hammond

At the time of the events in question, Hammond was the third highest-ranked officer in the East Los Angeles Office. Hammond denied she ever called Guzman to tell her about search warrants or about Peniche's sexual photos; she claimed instead Guzman had walked into Hammond's office to tell her that Peniche was concerned about sexual photos on her phone. Hammond denied anyone on the administrative investigation team provided her with any photographs or images from anyone. She specifically denied Lentz and Ruiz ever provided, showed, or told her about any such photographs or images of Peniche.[1]

---

[1] She was not asked if anyone else on the administrative investigative team had shown her any such photographs or images.

11

Hammond confirmed there were "rumors going around" that some officers were being investigated for theft.

### (l)    Doris Peniche

Peniche testified she never spoke about her sex life with her colleagues because "there is no secrets [*sic*] in the Highway Patrol.  Word travels quick, word spreads.  These guys, they talk."  Because Peniche and her husband were not having sex and she was reluctant to get divorced, she began an affair with another man around the end of 2016 or beginning of 2017.  Eventually, her husband discovered the affair, but the couple decided to try and reconcile.  Despite initial progress, however, the relationship soon reverted to a lack of intimacy, and Peniche restarted the affair.  When her husband discovered the renewed affair, he decided he was potentially moving out but never did.  The affair ended in mid-2018, and Peniche and her husband slowly reconciled.

In March 2019, after a meeting with others being investigated for overtime fraud as well as their lawyers, an investigator working for Peniche's attorney pulled her aside to inform her the investigator had just met with Guzman, who had said CHP had viewed sexual material from her phone, and had pictures and videos of her with her brother-in-law.  Peniche was embarrassed and ashamed, and was trying to figure out how she would tell her husband about the pictures and videos, as they were "on a good path of reconciling," and her husband did not know about the pictures or videos or about the details of the affair.  Peniche told her husband that night and he was hurt and sad; both cried.

Peniche also received a message from another CHP employee that let her know he, and "a group of people" were

12

aware of the sexual material on her phone.  Peniche felt very humiliated and ashamed, likening it to her "worst nightmare." She testified that every time she saw a CHP officer, she would get a "pit" in her stomach, wondering if the officer had seen her pictures.  Peniche stated she would put on a "brave face" but "on the inside, I have to drag myself, peel myself out of bed . . . even though I'm dying inside" and "just want to lay in bed."  Peniche related that there were "times I just lay in bed, I don't shower for days, and I just lay there. . . .  I can't breathe sometimes. . . .  I've never known what anxiety was until this happened to me."  She added that anxiety felt like "the walls are closing in on me" and she also cried periodically.

Peniche testified she did not go to a therapist because "ever since my pictures were leaked, I have trust issues.  I don't trust the department.  If my pictures and videos were easily leaked like that, . . . I don't have confidence in whoever I'm going to go speak to, the psychologist, . . . that our conversations are going to remain confidential."  She asked rhetorically, "If it wasn't held confidential while they -- while they got a search warrant, how do I know that this stuff is going to remain confidential?"

### (m)   Dr. Anthony Reading

Reading, a licensed psychologist, testified as an expert that Peniche's discovery that the sexual material from her cell phone "had been accessed, exposed, and disseminated" caused her to suffer from depression and anxiety.  He specifically diagnosed her with "adjustment disorder with depressed mood" and "adjustment disorder with anxiety," although he also testified "the adjustment disorder with depressed mood had resolved, and the adjustment disorder with anxiety is a condition that waxes and wanes according to literature.  So it's something that can

13

become quiescent." He explained the anxiety disorder could recur when Peniche was subject to triggers, which she had been avoiding. He recommended she receive "six months of weekly cognitive behavioral psychotherapy" and then three to four months "of weekly cognitive behavioral psychotherapy in the event she encounters reactivation" of the condition. Specifically, he predicted that she could reasonably expect to need "four additional treatment periods."

### (n)  Robert Gomez

Gomez, Peniche's husband, testified that after Peniche learned about CHP having her sexual material, she often stayed in bed all day, did not bathe, and behaved brusquely. She would complain about feeling a weight on her chest, and having difficulty breathing.

### 2.  Jury Instructions and Verdict Form

In reviewing the jury instructions with the court, appellants stipulated that, if Hammond were found liable for defamation, intentional infliction of emotional distress, or negligence, CHP would also be liable for defamation.

### (a)  Jury Instructions

Among other instructions, the court gave an instruction entitled "Negligence—Essential Factual Elements," informing the jury that for Peniche to prevail on her negligence cause of action, she was required to prove: "1. That either Melissa Hammond, Robert Ruiz, Matt Lentz, or the California Highway Patrol (through its employees) were negligent; [¶] 2. That Doris Peniche was harmed by the negligence; and [¶] 3. The negligence was a substantial factor in causing Doris Peniche's harm."

14

The court also issued "Presumption of Negligence per se," instructing: "Civil Code section 1798.24 states: 'An agency shall not disclose any personal information in a manner that would link the information disclosed to the individual to whom it pertains unless the information is disclosed . . . [¶ t]o those officers, employees, attorneys, agents, or volunteers of the agency that have custody of the information if the disclosure is relevant and necessary in the ordinary course of the performance of their official duties and is related to the purpose for which the information was acquired.' [¶] If plaintiff Doris Peniche proves [¶] 1. That defendant California Highway Patrol violated this law and [¶] 2. That the violation was a substantial factor in bringing about harm, [¶] then you must find that defendant California Highway Patrol was negligent unless you also find that the violation was excused. [¶] If you find that defendant California Highway Patrol did not violate this law or that the violation was not a substantial factor in bringing about the harm, or if you find the violation was excused, then you must still decide whether defendant California Highway Patrol was negligent in light of the other instructions."

Regarding emotional distress, the court gave an instruction entitled "Negligence—Recovery of Damages for Emotional Distress—No Physical Injury—Direct Victim—Essential Factual Elements." To prevail, the court stated Peniche was required to prove "1. That California Highway Patrol, Melissa Hammond, Robert Ruiz, or Matt Lentz was negligent; [¶] 2. That Doris Peniche suffered serious emotional distress; and [¶] 3. That California Highway Patrol, Melissa Hammond, Robert Ruiz, and/or Matt Lentz's negligence was a substantial factor in causing Doris Peniche's serious emotional distress."

15

Regarding damages, the court instructed the jury that "[t]he amount of damages must include an award for each item of harm that was caused by defendants' wrongful conduct" and that because "Doris Peniche seeks damages from more than one defendant" the jury was required to "determine the liability of each defendant to Doris Peniche separately."

### (b) Verdict Form

In the verdict form provided to the jury, on the topic of negligence, the jury was asked, "On Plaintiff's claim for negligence against Melissa Hammond, who do you find in favor of?" On the next line was the word "Plaintiff," followed by a blank line, and then the words "Melissa Hammond," followed by a blank line (permitting the jury to put a check mark in the blank line to indicate which party they found in favor of). The form asked the same question as to Lentz, Ruiz, and CHP. The verdict form did not ask the jury to specify on which theory of negligence they relied.

On the topic of damages, the verdict form first instructed the jury to determine damages only if it had found for Peniche on any of the causes of action. It then asked simply: "What are Plaintiff's damages?" This was followed by two lines: "Past damages" (followed by a blank line to be filled in) and "Future damages" (followed by a blank line to be filled in). There was no instruction or space to differentiate as to what damages were associated with which cause of action or which defendant.

### 3. Verdict and Judgment

After two days of deliberation, the jury found against Peniche on Intrusion of Private Affairs, Distribution of Private Sexual Material, Negligence as to Lentz and Ruiz, Intentional

16

Infliction of Emotional Distress as to Lentz and Ruiz, and Defamation. The jury found for Peniche on Negligence as to Hammond and CHP, and Intentional Infliction of Emotional Distress as to Hammond. However, the jury found Hammond did not act with malice, oppression, or fraud. The jury found Peniche suffered past damages of $750,000 and future damages of $250,000. In July 2024, the court entered judgment in favor of Peniche and against Hammond and CHP for $1,000,000.

### 4. Motion for Judgment Notwithstanding the Verdict

In August 2024, Hammond moved for judgment notwithstanding the verdict, arguing there was no substantial evidence supporting the verdict against her, and that she could not be liable for negligence because she lacked a duty to prevent Peniche from experiencing emotional distress. Specifically, she argued the evidence at most supported a conclusion that she told Guzman about the pictures in a private conversation—in which she obtained Guzman's promise that she would not tell anyone— but that no evidence showed she herself had or distributed the sexual material. She also argued that the jury's finding that she was not liable for defamation was fundamentally inconsistent with finding her liable for intentional infliction of emotional distress because both were based on the same facts. Moreover, she contended substantial evidence did not support the verdict because: (a) her conversation with Guzman did not constitute "so extreme as to exceed all bounds tolerated in a civilized society"; and (b) there was no evidence Peniche suffered severe emotional distress, or that any such distress was caused by Hammond's conversation with Guzman.

In September 2024, the court denied the motion. Regarding intentional infliction of emotional distress, the court found the verdict on defamation did not preclude liability for intentional infliction of emotional distress because defamation requires proof of different elements. Although Guzman testified that Hammond repeatedly asked her to keep secret the information she was about to share, the court found "Hammond should have expected that Guzman would share this information with others," given the "workplace environment where there was gossip between co-workers." The court also recalled Peniche's and her expert's testimony about her emotional distress "as providing sufficient basis for the severity of Plaintiff's distress." As for negligence, the court held that "Hammond had a duty to use ordinary care in the handling of Plaintiff's private information to avoid causing harm to Plaintiff."

CHP and Hammond timely appealed.

## DISCUSSION

### A. *Peniche's Complaint Is Not Barred by the Litigation Privilege*[2]

#### 1. The Litigation Privilege Does Not Apply

The litigation "privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or

---

[2] Peniche contends appellants forfeited this issue by failing to raise it below. Appellants disagree, arguing they asserted the privilege as an affirmative defense in their answer, and again in their motion for directed verdict. Because we find the privilege inapplicable, we need not resolve this dispute.

other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)

The jury found for Peniche and against Hammond and CHP on negligence, and against Hammond on intentional infliction of emotional distress. Appellants contend the litigation privilege bars these claims because their bases—the sharing of Peniche's sexual material and Hammond's conversation with Guzman—are "communicative in nature" and relate to the overtime fraud investigation. We are unpersuaded.

First, the negligence claim against CHP was not based solely on the sharing of the sexual material with others, or Hammond's conversation with Guzman. As appellants recognize, "Peniche contends that CHP was negligent when the criminal investigation team did not seal or partition her sexual photos and videos." The failure to seal and partition is not "communicative in nature."

Second, for the litigation privilege to apply, a communication must not only relate to the proceeding but must also be made "to achieve the objects of the litigation." (*Silberg v. Anderson*, *supra*, 50 Cal.3d at p. 212.) Appellants do not explain, and we do not see, how Hammond's conversation with Guzman, or any sharing of Peniche's sexual material outside the investigation teams, furthered the fraud investigation.

### 2. Appellants' Authority Is Inapposite

Appellants cite to a myriad of authorities discussing the wide-ranging application of the litigation privilege. All cases cited are distinguishable because, unlike in this appeal, the communications at issue therein were made to achieve the goals

19

of the litigation. (See *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1547 ["objected-to statements were communicated to CDCR officials as part of an internal investigation of Hansen and concerned his alleged misconduct and criminal wrongdoing" and thus "were absolutely privileged under Civil Code section 47, subdivision (b)"]; *Tom Jones Enterprises, Ltd. v. County of Los Angeles* (2013) 212 Cal.App.4th 1283, 1288, 1294 [allegation that Sheriff's Department employee negligently instructed bank to release funds barred by litigation privilege]; *Foothill Federal Credit Union v. Superior Court* (2007) 155 Cal.App.4th 632, 635–636 [bank's production of documents in response to subpoena protected by litigation privilege]; *Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 367–368 [medical expert's provision of report to and communication with Solicitor's Disciplinary Tribunal in London at tribunal's request absolutely privileged where expert was asked to evaluate plaintiff's claim he could not travel to England or participate in tribunal proceedings due to illness]; *Harris v. King* (1998) 60 Cal.App.4th 1185, 1186 [medical expert's report to State Compensation Insurance Fund about plaintiff's medical condition resulting from industrial accident subject to litigation privilege]; *Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 953–954, 956 [letter from county's victim witness program to court reporting plaintiff had molested his nephew in connection with family law proceeding to lift order prohibiting plaintiff from seeing certain other children subject to litigation privilege]; *Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 341–343 [plaintiff's claim for intentional infliction of emotional distress barred by litigation

20

privilege when acts causing distress connected to attempts to collect debt subsequently litigated in arbitration].)

### B. *Duty of Care*

Appellants do not contend that substantial evidence does not support the jury's verdict on negligence. Instead, they argue the court erred by instructing the jury that: (1) CHP and Hammond could be liable for negligence when they had no duty to avoid causing Peniche emotional distress; and (2) CHP could be presumptively negligent if it violated Civil Code section 1798.24. We conclude the trial court did not err in instructing the jury that CHP and Hammond could be liable for general negligence. Because the jury returned a verdict finding CHP and Hammond liable for negligence without specifying on which theory they relied, we need not address whether the court erred in instructing the jury on presumptive negligence.

### 1. Negligence

The court instructed the jury that CHP could be found liable for negligence if CHP was negligent "through its employees." Appellants argue this instruction was erroneous because, citing *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984–985 (*Potter*), "in California, there is no legal duty 'to avoid negligently causing emotional distress to another.' " *Potter* is distinguishable.

First, unlike this case, *Potter* "is not a case in which a negligence cause of action is predicated only on a claim that the defendant breached a duty to avoid causing emotional distress." (*Potter*, *supra*, 6 Cal.4th at p. 985.) Regardless, *Potter* expressly stated that, while "there is no independent tort of negligent infliction of emotional distress," emotional distress damages can

21

be recovered when caused by negligence. (*Id.* at p. 984.) "[D]amages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and . . . a cause of action to recover damages for negligently inflicted emotional distress will lie . . . in cases where a duty arising from a preexisting relationship is negligently breached." (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1074.) "[P]hysical injury is not a prerequisite for recovering damages for *serious* emotional distress, especially when, as here, there exists a 'guarantee of genuineness in the circumstances of the case.'" (*Id.* at p. 1079.)

While *Potter* does state that, although emotional distress damages can be awarded for negligence in certain circumstances, "with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests" (*Potter, supra,* 6 Cal.4th at p. 985), it does not discuss whether emotional distress damages can be awarded for negligence when the breach of duty threatens only emotional harm, and not physical, material, or financial injury. For guidance on that scenario, we look to the high court's decision in *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 (*Molien*).

In *Molien,* after a doctor negligently and mistakenly diagnosed plaintiff's spouse with syphilis, he instructed her to inform plaintiff of the diagnosis so he could be tested for the disease as well. (*Molien, supra,* 27 Cal.3d at p. 919.) Plaintiff did not have syphilis, but the spouse's diagnosis sparked suspicions of cheating and caused the marriage to dissolve. (*Id.* at p. 920.) Although the plaintiff suffered neither physical harm nor any threat of physical harm, our Supreme Court concluded he could state a claim for negligence. (*Id.* at pp. 923–931; see also *id.* at

22

p. 929 ["the border between physical and emotional injury is not clearly delineated" and thus "the attempted distinction between physical and psychological injury merely clouds the issue"]; *id.* at p. 930 [whether plaintiff suffered emotional distress "is a matter of proof to be presented to the trier of fact" as "jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience"].)

Appellants further contend that emotional distress damages without physical injury are awardable only in certain "rare exceptions" such as " 'certain specialized classes of cases where the negligence is of a type which will cause highly unusual as well as predictable emotional distress.' " Even were such an exception needed, it would exist here—the unnecessary sharing of the intimate photographs and videos of a plaintiff engaging in sexual acts with a non-spouse is virtually certain to cause highly unusual as well as predictable emotional distress.

Thus, CHP and Hammond could be liable for negligent breach of a duty of care, even though Peniche only sought emotional distress damages.[3]

_____

[3] CHP also argues that "[p]olicy considerations" weigh against the finding of a duty here because "[e]xposing every law enforcement agency and officer in the State to a negligence cause of action for emotional distress based on the manner in which evidence is handled internally during the course of an investigation would unreasonably impact investigations, and ultimately lead to additional burdens, costs, and liabilities that would be borne by taxpayers." CHP appears to be invoking the *Rowland* factors to argue we should accept that an exception to the duty of care applies under the facts of this case. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112–113.) Because CHP provides *(Fn. is continued on the next page.)*

23

## 2.     Presumption of Negligence

Evidence Code section 669, subdivision (a) provides that "[t]he failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."  When instructing the jury, the court informed the jurors that if CHP violated Civil Code section 1798.24 and the violation was a substantial factor in harming Peniche, then the jury was required to find CHP negligent unless it also found the violation excused.

Appellants contend this instruction was erroneous because only statutes imposing mandatory duties on a state entity can be a basis for presumptive negligence, and Civil Code section 1798.24 imposed a prohibitory duty.  (See Gov. Code, § 815, subd. (a) ["Except as otherwise provided by statute[,] [¶] . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person"]; *id.* at § 815.6 ["Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public

---

insufficient analysis to support the exception, we will not undertake that analysis.  (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].)

24

entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty"].)

Peniche counters that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (Gov. Code, § 815.2, subd. (a).) Further, Peniche asserts that "because the jury could find Negligence *without* reference to Civil Code § 1798.24, and because Appellants point to no portion of the record indicating the jury's verdict was only based on Negligence Per Se, there is no need for further analysis." We agree with Peniche.

As discussed herein, we find no error as to the jury's verdict regarding Hammond. Nor does CHP dispute Hammond was acting in the scope of her employment. As such, CHP is liable for the injury to Peniche under Government Code section 815.2.[4]

Additionally, there is no dispute the court instructed the jury on general negligence, as well as presumptive negligence. However, the jury was asked a single question regarding negligence as to each defendant ("Who do you find in favor of?"). The jury was not asked to indicate on which theory of negligence they relied. When a jury is presented with multiple negligence theories "and returned a verdict without specifying which theory it relied on[, . . . ] the verdict will be sustained if any one theory is

---

[4] In fact, CHP stipulated that, were the jury to find Hammond liable for intentional infliction of emotional distress or negligence, CHP would also be liable.

25

supported by substantial evidence and is unaffected by error." (*Scott v. C.R. Bard, Inc.* (2014) 231 Cal.App.4th 763, 777.)

Therefore, we need not address whether the court erred in giving the presumptive-negligence instruction.

### C. *We Need Not Address Appellants' Contentions Regarding Intentional Infliction of Emotional Distress*

Hammond urges us to reverse the jury's verdict on intentional infliction of emotional distress because substantial evidence does not support it. Because we do not reverse the finding that Hammond is liable to Peniche for negligence, we need not consider this issue.

The jury was instructed that if it found any of the defendants liable, it was to determine Peniche's damages. In doing so, the jury was instructed to award damages "for each item of harm that was caused by defendants' wrongful conduct" and to determine the liability of each defendant separately.

The jury found both CHP and Hammond liable for negligence, and Hammond additionally liable for intentional infliction of emotional distress. Per its instructions, we presume the jury then determined what damages to award for the harm caused by Hammond's wrongful conduct. (See *Cassim v. Allstate Ins. Co.* (1999) 33 Cal.4th 780, 803–804 ["Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' "].)

As appellants themselves contend, both findings of liability against Hammond were based on the same conduct—the conversation Hammond had with Guzman about the sexual material found on Peniche's phone. The jury thus calculated a

26

single amount to compensate Peniche for the harm she suffered due to Hammond's conduct, even though Hammond was liable under more than one legal theory. (See e.g., *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702 [" 'Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited' "].)

Because Hammond is liable under the theory of negligence for the damages caused by her conduct, even were we to agree with appellants that substantial evidence does not support liability for intentional infliction of emotional distress, such an error would not be prejudicial—Hammond and CHP would both still be liable to Peniche for $1,000,000. Therefore, we need not consider whether substantial evidence supports the jury's intentional infliction of emotional distress verdict. (See *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 [California Constitution " 'prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial' "]).

## DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.                    WEINGART, J.

27